**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                                                          |   |                          |
|----------------------------------------------------------|---|--------------------------|
| SYLVIA WONASUE,                                          | * |                          |
|     **Plaintiff,**                   | * |                          |
| **v.**                                                   | * | Case No.: PWG-11-3657    |
| UNIVERSITY OF MARYLAND ALUMNI ASSOCIATION, *et al.*,     | * |                          |
|     **Defendants.**                  | * |                          |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

This Memorandum Opinion addresses and disposes of the Motion for Summary Judgment and accompanying Memorandum that Defendants Danita Nias and the University of Maryland Alumni Association ("UMAA") filed, ECF Nos. 64 & 64-1. Plaintiff Sylvia Wonasue has not filed a response, and the time for doing so has passed. *See* Loc. R. 105.2.a; ECF No. 71 (denying Plaintiff's Motion to Extend Time for Response and to Accept Response Filed Out of Time, ECF No. 65); ECF No. 76 (denying Plaintiff's Motion for Reconsideration of Court's Order Regarding Plaintiff's Motion for the Defendants to Provide and for the Court to Consider the Full Deposition Transcript, ECF No. 72). For the reasons that follow, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

# I. BACKGROUND[1]

On Wednesday, January 13, 2010, Ms. Wonasue felt weak, "almost faint," and nauseous, and she was vomiting and bleeding "a little." Wonasue Dep. 150:15 – 151:6, 152:19 – 153:1.[2] She went to the emergency room at Bowie Health Center and learned that she was pregnant. *Id.* at 150:7–16, 152:14–16. Plaintiff testified that the emergency room physician, Fabrice Czarnecki, M.D., told her that she "was experiencing . . . the early sickness symptoms associated with pregnancy," and that she "had low potassium which was related to [her] eating." *Id.* at 154:18 – 155:1. He did not "tell [her] that the vomiting and nausea was associated with any other medical condition." *Id.* at 151:7 – 152:1. Plaintiff testified that she "was really sick" that day, but "that's the only time [she] remember[s] really vomiting like that during the pregnancy, and weak and faint." *Id.* at 156:14–17. Plaintiff characterizes these symptoms as "severe and unusual medical complications" to her pregnancy. Compl. ¶¶ 18–19, ECF No. 1.

Dr. Czarnecki prescribed a "potassium medication because [Ms. Wonasue] needed that to help with the baby[,] [a]nd he may have given [her] pills to help with the nausea." Wonasue Dep.

---

[1] In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004). Because Defendants' Motion is unopposed, "those facts established by the motion" are "uncontroverted." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

[2] Plaintiff's November 1, 2012 deposition testimony cited here appears in three separate exhibits. Pages 148–60 appear in Exhibit 5 to Defendants' Opposition to Plaintiff's Amended Motion for Leave to File an Amended Complaint, ECF No. 50-5; pages 173–81 appear in Exhibit 6 to the same, ECF No. 50-4; and pages 163–67 appear in Exhibit A to Defendants' Motion for Summary Judgment, ECF No. 64-2. The discharge papers from Plaintiff's January 13, 2010 emergency room visit, Exhibit 10 from Ms. Wonasue's deposition, also appear in Exhibit A to Defendants' Motion for Summary Judgment. Although the exhibits to Defendants' Opposition to Plaintiff's Amended Motion for Leave to File an Amended Complaint are not cited in Defendants' Memorandum in support of their Motion for Summary Judgment, they are a part of the record and I may consider them. *See* Fed. R. Civ. P. 56(c)(3).

at 154:12–14.  Plaintiff testified that the physician "just thought that [she] needed to regulate the potassium" and "other than that, he didn't think it was a big deal."  *Id.* at 155:4–6.  She said that Dr. Czarnecki did not recommend "any major change regarding . . . food."  *Id.* at 156:3–11.  Plaintiff testified that the physician told her that her health "could create a problem with the pregnancy," and therefore he "wanted [her] to stay calm, take bed rest, drink lots of water . . . . don't do any heavy work or heavy lifting, stride slowly, things like that."  *Id.* at 157:2–10.

Plaintiff's discharge papers from Bowie Health Center included Discharge Instructions and a Work Release Form.  The instructions indicated that she had hypokalemia, "a low level of potassium in the blood," for which she was directed to "[t]ake any potassium supplements prescribed" and "[e]at foods rich in potassium."  Discharge Instructions 2.  Plaintiff also suffered from dehydration, for which she was directed to drink appropriate amounts of fluids.  *Id*. at 3.  Additionally, the instructions indicated that Plaintiff had hyperemesis of pregnancy, "a severe form of 'morning sickness', where the vomiting is excessive and may cause dehydration and chemical imbalances in the body."  *Id*. at 4.  The instructions discussed an appropriate diet, suggested Vitamin B6 to help reduce nausea, warned against "strong medicines during pregnancy," and directed Plaintiff to contact her gynecologist to schedule "an appointment to be seen within the next 4 days."  *Id.*  The "Activity" section, in its entirety, stated: "After awakening from sleep, remain in bed for 15 minutes before getting up."  *Id.*

At the time, Plaintiff was working as executive manager of UMAA. Compl. ¶ 9.  The Work Release Form stated that Ms. Wonasue "may return to work on 01/15/2010 with the following restrictions: None."  Work Release 1; *see* Wonasue Dep. 164:10–12 (Work Release Form said that Plaintiff could "return to duty on January 15, 2010").  Plaintiff testified that her January 13, 2010 emergency room visit was her "only medical visit . . . prior to leaving the

Alumni Association," and that she only received one "work release form . . . related to [her] pregnancy before [she] left the Alumni Association." Wonasue Dep. 163:9–16.

Plaintiff "thought" she was supposed to be on bed rest "for two weeks initially." *Id.* at 167:17–18. During her deposition, Plaintiff could not identify where in her discharge papers the physician ordered bed rest after January 15, 2010, but she said that "he talked to [her] about it that day at the hospital." *Id.* at 177:12–20. She insisted that the physician "did tell [her] specifically that [she] needed to get bed rest," and that "[h]e was worried because the vomiting was severe" and Plaintiff "was so faint." *Id.* at 178:9–12. Plaintiff insists that she "had a paper" from her January 13, 2010 emergency room visit that "said on it have bed rest, drink a lot water, all the specific instructions," but at her deposition, Plaintiff did not "know where it is." *Id.* at 164:13–21. Yet, she also testified that the physician "didn't say [she] couldn't work," *id.* at 165:10–12, and did not "tell [her] that [she] had to stop work temporarily," although "he told [her that she] had to get bed rest," *id.* at 166:3–6.

Plaintiff testified that, two days later, on Friday, January 15, 2010, she told her supervisor, Defendant Nias, that she was pregnant, that she had "been feeling sick the past weekend," that she experienced "vomiting and weakness," that she went to the hospital, and that "the doctor had advised [her] to take bed rest." Wonasue Dep. 173:7 – 174:12. Plaintiff also testified that she told Ms. Nias that the physician gave her "specific instructions to take bed rest, drink water, . . . not to do any heavy lifting, and stride slowly." *Id.* at 174:18–21. Yet, in the "Fact-Finding Statement" Plaintiff provided for the Maryland Department of Labor, Licensing and Regulation's Office of Unemployment Insurance's Fact Finding Report, Plaintiff stated that, when she asked to "work from home two days per week" so that she "would not have to be on [her] feet all day," she "did not indicate any medical restrictions, because at that time [she] did

not have any."  Fact Finding Report, Defs.' Request for Admissions Ex. 1, Defs.' Mem. Ex. E, ECF No. 64-6.  In their Memorandum, Defendants agree with Ms. Wonasue's testimony, but only insofar as she testified that she "told Nias that she had 'not been feeling well' and that she had gone to the hospital and learned that she was pregnant."  Defs.' Mem. 4.

Plaintiff said that "most of what [she] was doing" at work, she "could do from home," so she asked permission to "take some time off to work from home on and off just in the interim until [she felt] better," as she "wouldn't mind sitting at home and doing it in bed just so [she could] follow the doctor's instructions."  Wonasue Dep. 175:1–7.  According to Plaintiff, she requested "reasonable accommodation[s]" and "leave" because, "[b]eginning on January 15, 2010, Plaintiff required medical leave and reasonable changes to her work schedule to accommodate severe and unusual medical complications that threatened her own and her baby's health." Compl. ¶¶ 19–21.  Plaintiff showed Ms. Nias the paperwork she received from the physician.  Wonasue Dep. 175:8–17.  Plaintiff said that Ms. Nias "didn't read" or "take" the documents Plaintiff offered to her, and did not want Ms. Nias to put them in her inbox. *Id.* at 179:19–20, 181:4–8.  Plaintiff also asked Ms. Nias if, alternatively, she could use her sick or annual leave.  Pl.'s Answers to Interrogs. 4, Defs.' Mem. Ex. D, ECF No. 64-5.

Plaintiff claims that Ms. Nias denied her requests, Wonasue Dep. 180:17–19, and instead tried "to force her out of her position by, among other examples, changing her work schedule to make it less accommodating, giving her [an] impossible set of tasks and timeframe to perform them in, [and] specifying duties that she clearly could not perform given her medical condition . . . ."  Compl. ¶¶ 21, 23.  According to Plaintiff, she "attempted to perform according to Defendants' demands, . . . and this further jeopardized her baby's and her own health and lives," as she "experienced such severe medical complications, that she was rushed by

ambulance to the emergency room" and then "her physicians altered her medical status and required her to go on bed rest . . . ." *Id.* ¶¶ 24–26. Plaintiff submitted her resignation letter on January 19, 2010. Wonasue Dep. Ex. 14. Plaintiff insists that she was constructively discharged from her position. *Id.* ¶ 27. Yet, in her statement to the Maryland Department of Labor, Licensing and Regulation's Office of Unemployment Insurance, Plaintiff declared that her decision to resign "was a personal choice." Fact Finding Report. Her employer noted that, "[h]ad she indicated any medical restrictions, she could have filed for an FMLA leave of absence, as she would have been eligible." *Id.*

Plaintiff said that she saw her obstetrician "[l]ater, after [she] left the alumni," and "he said that [she] needed rest, too." Wonasue Dep. 163:5–8. She testified that "after [she] left the Alumni Association, [she] almost had a miscarriage," so she "went to Bowie Hospital, and then they took [her] by ambulance to PG and gave [her] lots of treatments and stuff for that." *Id.* at 158:11–15. On February 2, 2010, her obstetrician put her on bed rest through October 29, 2010 due to "pregnancy bleeding." Fact Finding Report. Plaintiff stated that, at that time, she "had already made the decision to quit." *Id.* After that, she "was sick a lot during most of the pregnancy," which her doctor "thought . . . was stress related." Wonasue Dep. 158:16 – 159:2. Plaintiff had to take stress tests every week toward the end of her pregnancy. *Id.* at 159:3–11.

Plaintiff filed a nine-count complaint against UMAA and Ms. Nias. She voluntarily dismissed three counts alleging due process claims (Counts V, VI, and VII), Pl.'s Opp'n to Defs.' Mot. to Dismiss 1, ECF No. 7, and this Court dismissed Count IX, "Violation of Maryland Common Law Implementing the Family and Medical Leave Act Pursuant to 29 U.S.C. § 2601 *et seq* and Unlawful Termination," June 1, 2012 Order, ECF No. 10, leaving five counts. The remaining claims against Defendants are failure to accommodate and discriminatory discharge in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112 – 12213 (Count I); unlawful employment practices, namely disability discrimination, failure to accommodate, and constructive discharge, in violation of the Discrimination in Employment subtitle of the Maryland State Government Article ("Maryland Employment Discrimination Law"), Md. Code Ann., State Gov't §§ 20-601 – 20-609 (Count II); disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. §§ 701 – 796*l*, in particular, § 794 (Count III); retaliation in violation of the Rehabilitation Act (Count IV); and interference with Plaintiff's rights as a person with a "serious health condition" under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615 (Count VIII).

## II.    DISCUSSION

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, No. 12-1722, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). When the nonmoving party does not oppose a summary judgment motion, "those facts established by the motion" are "uncontroverted." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). Nonetheless, the moving party still must demonstrate that, based on those facts, that party is

entitled to judgment as a matter of law, because "[t]he failure to respond to the motion does not automatically accomplish this." *Id.*

## A.    Proof of Disability

Preliminarily, I note that courts construe the Rehabilitation Act, the ADA, and Maryland Employment Discrimination Law together, such that disability discrimination claims brought under these three statutes share elements. *See Works v. Colvin*, 519 F. App'x 176, 184, 2013 WL 1749532, at *7 (4th Cir. 2013) ("The analysis used to determine whether an employer has discriminated under the Rehabilitation Act is the same as the analysis under the Americans with Disabilities Act . . . .") (citing *Hooven–Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001)); *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264 n.9 (4th Cir. 1995) (same); 29 U.S.C. § 794(d) ("The standards used to determine whether this section [of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 *et seq.*) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment."); *Carrier v. VCA Animal Hosps., Inc.*, No. DKC-11-129,  2012 WL 3536758, at *8 (D. Md. Aug. 13, 2012) ("For guidance in applying this requirement [of reasonable accommodations under the Maryland Employment Discrimination Law], the court may look to federal law interpreting the Rehabilitation Act of 1973."); *Goel v. Tishcon Corp.*, No. L-10-2536, 2011 WL 836680, at *3 (D. Md. Mar. 2, 2011) (Maryland Employment Discrimination Law is an "analogue" to the ADA.); *Mass Transit Admin. v. Md. Comm'n on Human Relations*, 515 A.2d 781, 786-87 (Md. Ct. Spec. App. 1986) (noting that "[the] guidelines [on employment discrimination] were modelled [*sic*] after the Federal Rehabilitation Act of 1973, 29 U.S.C.

§ 706(7)(B). Accordingly, this court has looked to cases interpreting the federal statute for guidance in interpreting the Maryland [Employment Discrimination Law]").[3]

Thus, to survive Defendants' Motion for Summary Judgment on her claims for discriminatory constructive discharge and failure to accommodate under the ADA and Maryland Employment Discrimination Law, as well as disability discrimination under the Rehabilitation Act and Maryland Employment Discrimination Law, Plaintiff must prove that she has a disability. *See Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264–65 (4th Cir. 1995) ("In order to establish a violation of either [the Rehabilitation Act or the ADA], a plaintiff must prove: (1) *that he has a disability*; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability.") (emphasis added); *Gaither v. Anne Arundel Cnty.*, 618 A.2d 244, 247 (Md. Ct. Spec. App. 1993) ("To present a *prima facie* case, [a plaintiff claiming unlawful employment practices based on disability under Maryland Employment Discrimination Law] must establish that he was handicapped, that he was physically able to perform the duties of [his employment], and that his demotion was based solely on his handicap."); *see also Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004) ("To establish a *prima facie* wrongful discharge claim under the ADA, a plaintiff must show that (1) [*he*] *was a qualified individual with a disability*; (2) [he] was discharged; (3) [he] was fulfilling [his] employer's legitimate expectations at the time of discharge; and (4) the

_____

[3] *Cf. Carrier*, 2012 WL 3536758, at *8 n.18 (noting that "[a] court in this district has cautioned, however, that 'there is no evidence that Maryland intended to enact Art. 49B as a state "counterpart" to the federal Rehabilitation Act or the Americans with Disability Act,'" but, "[b]ecause the parties [did] not identify any authority, nor [was] the court aware of any, that suggests that the ADA or the Rehabilitation Act would not be instructive regarding VCA's duty to provide reasonable accommodation to Dr. Carrier, the court … look[ed] to federal law as needed to resolve this claim") (quoting *Kohler v. Shenasky*, 914 F. Supp. 1206, 1211 (D. Md. 1995)).

circumstances of [his] discharge raise a reasonable inference of unlawful discrimination.") (emphasis added) (internal quotation marks omitted); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 (4th Cir. 2001) ("[C]laims under the ADA for unlawful termination and failure to make a reasonable accommodation both require a showing that [the plaintiff] was 'disabled' within the meaning of the ADA."); *id.* at 387 n.11 ("In a failure to accommodate case, a plaintiff establishes a prima facie case by showing (1) that *he was an individual who had a disability* within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." (emphasis added) (citation omitted)).

For purposes of these three statutes, a disability is any one of the following: "'(A) a physical … impairment that substantially limits one or more . . . major life activities . . . ; (B) . . . a record of such an impairment; or (C) [when an individual is] regarded as having such impairment.'" *See Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 (4th Cir. 2004) (quoting 42 U.S.C. § 12102(2) (ADA definition)); 29 U.S.C. § 705(9)(B) (adopting ADA definition for § 794 of the Rehabilitation Act). *Compare* 42 U.S.C. § 12102(2) (defining disability as "A) a physical . . . impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment"), *with* State Gov't § 20-601 (defining "disability" as "(i) . . . a physical disability, infirmity, malformation, or disfigurement that is caused by bodily injury, birth defect, or illness . . . ; (ii) a record of having a physical . . . impairment as otherwise defined under this subsection; or (iii) being regarded as having a physical . . . impairment as otherwise defined under this subsection"), *and Mass Transit Admin. v. Md. Comm'n on Human Relations*, 515 A.2d 781, 786–87 (Md. Ct. Spec. App. 1986) (noting that "to demonstrate that an individual is

handicapped within the meaning of the Maryland discrimination laws, an individual must show that he: 'A. Has a physical, mental, or emotional handicap … which constitutes or is regarded as constituting a substantial limitation of one or more of a person's major life activities. … B. Has a record of such a handicap…. C. Is regarded as having such a handicap. …'") (quoting COMAR 14.03.02.03 (1979) (emphasis removed).

The ADA identifies the following "major life activities": "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2); *see Pisani v. Baltimore City Police*, No. WDQ-12-1654, 2013 WL 4176956, at *7 (D. Md. Aug. 14, 2013) (quoting 42 U.S.C. § 12102(2)).  An impairment "substantially limits" one of these activities if the plaintiff is "'significantly restricted'" in that activity.  *White v. Home Depot, U.S.A., Inc.*, No. DKC-13-624, 2013 WL 4501328, at *3 (D. Md. Aug. 21, 2013) (quoting *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 467 (4th Cir. 2002)); *see* 29 C.F.R. § 1630.2(j)(1).  "'[I]n determining whether an impairment is substantially limiting, courts may consider the "nature and severity of the impairment," the "duration or expected duration of the impairment," and the "permanent or long term impact" of the impairment.'" *White*, 2013 WL 4501328, at *3 (quoting *Pollard*, 281 F.3d at 467–68 (quoting 29 C.F.R. § 1630.2(j)(2))). A "'temporary impairment,'" such as one that "'is expected to improve in a relatively short period of time,'" does not substantially limit a plaintiff's major life activities.  *Id.* (quoting *Pollard*, 281 F.3d at 468).

Significantly, a plaintiff "cannot state a claim under the ADA" by alleging that she was discriminated against due to her pregnancy alone, because "pregnancy is not a disability under the ADA." *Genovese v. Harford Health and Fitnes Club, Inc.*, No. WMN-13-217, 2013 WL

2490270, at *5 n.3 (D. Md. June 7, 2013) (citation and quotation marks omitted); *see Young v. United Parcel Serv.*, 707 F.3d 437, 443 (4th Cir. 2013) ("'With near unanimity, federal courts have held that pregnancy is not a 'disability' under the ADA.'") (quoting *Wenzlaff v. NationsBank*, 940 F. Supp. 889, 890 (D. Md. 1996) (concluding that pregnancy is not a disability under the ADA)). The Fourth Circuit "ha[s] not decided whether complications due to pregnancy can constitute a disability under the [Rehabilitation Act]." *Brockman v. Snow*, 217 F. App'x 201, 209 (4th Cir. 2007).

Defendants assert that "Wonasue was not 'disabled' within the meaning of the ADA, the Rehabilitation Act, or the Maryland Code" because "pregnancy and related medical complications generally do not constitute a 'physical impairment' under the ADA, absent unusual circumstances, which do not exist in this case." Defs.' Mem. 10. According to Defendants, "Wonasue had only common, temporary symptoms such as nausea, vomiting, and dehydration associated with routine morning sickness," and "[t]he only 'treatment' that the doctor ordered was, one day of bed rest, a prescription for anti-nausea medication, and for her to take some vitamins for her slightly low potassium." *Id*. at 12. Defendants insist that "Wonasue has not established (nor has she even alleged) that she was limited in the major life activity of working, let alone, substantially limited in any other way because of her morning sickness." *Id*. at 11. In their view, the fact that "Wonasue's doctor did not believe that her morning sickness limited her in any way" is sufficient to "establish[] that Wonasue was not limited in performing any major life activity." *Id*. Defendants argue that any impairment Plaintiff experienced was too short to substantially limit a major life activity. *Id*.

Plaintiff has not alleged that Defendants regarded her as having a substantially-limiting impairment. *See* 42 U.S.C. § 12102(2)(C). To the extent that she claims that she had a

substantially-limiting impairment or a record of such an impairment, *see* 42 U.S.C. § 12102(2)(A)–(B); Compl. ¶ 44 (Plaintiff had a "pregnant and medical condition" of which Defendants were aware), *Brockman*, 217 F. App'x 201, is informative. There, the plaintiff, a program analyst for the IRS, "became pregnant and was hospitalized for acute pregnancy complications, including bleeding and threatened abortion." *Id*. at 204. She received a "medical certificate" for her doctor "endorsing her ability to work from home if she remained on bed rest until further notice; there was no indication of how long the bed rest would be necessary." *Id*. The plaintiff called her supervisor and asked to work from home, and she faxed her supervisor a copy of the medical certificate. *Id*. Her supervisor denied the request. *Id*. The plaintiff filed suit, alleging, *inter alia*, failure to accommodate under the Rehabilitation Act. *Id*. at 205. The district court granted summary judgment in favor of the IRS on the Rehabilitation Act claim on the basis that "Brockman failed to show a disability under the Act." *Id*. On appeal, the Fourth Circuit concluded that, even if "pregnancy complications may constitute a disability, Brockman's evidence [fell] far short of showing that she was substantially limited in a major life activity" where "[t]he only evidence Brockman proffer[ed] in this regard [was] her doctor's note stating that she should be on bed rest 'until further notice,' and the claim that the doctor orally instructed her not to walk long distances." *Id*. at 209. The court noted that the plaintiff did not offer "evidence of the duration of her impairment" or "its severity," two "factors that would point to a finding of a substantial limitation." *Id*.

Here, Plaintiff alleges that she was pregnant. Compl. ¶ 17. This alone is not enough for Plaintiff to have a "disability" under the ADA or the Rehabilitation Act or Maryland Employment Discrimination Law, which share the ADA definition. *See Young*, 707 F.3d at 443; *Genovese*, 2013 WL 2490270, at *5 n.3; *Wenzlaff*, 940 F. Supp. at 890. Ms. Wonasue also

claims that, "[b]eginning January 15, 2010, Plaintiff required medical leave and reasonable changes to her work schedule to accommodate *severe and unusual medical complications* [to her pregnancy] that threatened her own and her baby's health." Compl. ¶¶ 18–19 (emphasis added). Such complications could constitute a disability under the ADA, *Brockman*, 217 F. App'x at 209, although my research has not uncovered any case in either the Fourth Circuit or this Court with such a holding to date.

Even if Plaintiff claimed sufficient complications to constitute a disability, the evidence belies Plaintiff's assertion. It is true that Plaintiff experienced more than typical morning sickness; she was diagnosed with hyperemesis of pregnancy, "a severe form of 'morning sickness', where the vomiting is excessive and may cause dehydration and chemical imbalances in the body." Discharge Instructions 4. Nonetheless, even with this diagnosis, the emergency room physician stated that Plaintiff could go back to work on January 15, 2010 with no restrictions. Work Release 1; *see* Wonasue Dep. 164:10–12; Discharge Instructions 4. Indeed, Plaintiff testified that the emergency room physician "just thought that [she] needed to regulate the potassium" and "other than that, he didn't think it was a big deal." Wonasue Dep. 155:4–6. She also testified that the physician "didn't say [she] couldn't work," *id.* at 165:10–12, and did not "tell [her] that [she] had to stop work temporarily," *id.* at 166:3–6. Additionally, she stated that she "did not have any" medical restrictions at the time she asked to work from home. Fact Finding Report. Although Plaintiff "thought" she was supposed to be on bed rest "for two weeks initially," *id.* at 167:17–18, she did not identify any evidence to that effect. *See id.* at 164:13–21, 177:12–20. Thus, the "complications" that Plaintiff experienced were less severe than in *Brockman*, 217 F. App'x at 204, 209, where the plaintiff experienced "acute pregnancy complications, including bleeding and threatened abortion" and was put on bed rest for an

indeterminate time, and the Fourth Circuit still found the circumstances insufficient to establish that the plaintiff "was substantially limited in a major life activity."

Plaintiff may have had other complications with her pregnancy after her employment with UMAA ended. *See* Wonasue Dep. 158:11– 159:11, 163:5–8; Fact Finding Report. But, Plaintiff must show that she had a disability when she sought accommodations or when she felt she had to resign, as the alleged disability must have existed at the time of the purported discrimination for the discrimination to have been due to the disability. *See, e.g.*, *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264–65 (4th Cir. 1995) ("In order to establish a violation of either [the Rehabilitation Act or the ADA], a plaintiff must prove: . . . that he was excluded from the employment or benefit *due to* discrimination solely on the basis of the disability.") (emphasis added); *Gaither v. Anne Arundel Cnty.*, 618 A.2d 244, 247 (Md. Ct. Spec. App. 1993) ("To present a *prima facie* case, [a plaintiff claiming unlawful employment practices based on disability under Maryland Employment Discrimination Law] must establish that . . . his demotion *was based* solely on his handicap.") (emphasis added). Therefore, any later complications are not relevant to whether she had a disability. *See generally Doe*, 50 F.3d at 1264–65; *Gaither*, 618 A.2d at 247. Consequently, Plaintiff has not put forth sufficient evidence to lead a reasonable jury to conclude that she had an impairment that "substantially limit[ed]" any "major life activit[y]," such as work. *See* 42 U.S.C. § 12102(2); *Pisani*, 2013 WL 4176956, at *7. Plaintiff has not shown that she had a disability for purposes of the ADA, the Rehabilitation Act, or Maryland Employment Discrimination Law, *see* 42 U.S.C. § 12102(2); *Rohan*, 375 F.3d at 273, and thus, she cannot establish a prima facie case of discrimination, discriminatory discharge, or failure to accommodate under any of these statutes. *See Doe*, 50

F.3d at 1264–65; *Gaither*, 618 A.2d at 247.  Defendants' Motion for Summary Judgment as to Counts I, II, and III is GRANTED.

### B. Retaliation in Violation of the Rehabilitation Act (Count IV)

The Rehabilitation Act proscribes discrimination against an "otherwise qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a).  It does not proscribe retaliation *per se*, but "it incorporates the remedies applicable under the ADA including 42 U.S.C. § 12203(a) which makes it unlawful to retaliate against individuals for making a charge, testifying, assisting, or participating in an investigation, proceeding or hearing regarding charges of disability discrimination." *Berkner v. Blank*, No. DKC-12-1390, 2013 WL 951562, at *8 (D. Md. Mar. 11, 2013) (citing 29 U.S.C. § 794a).  Additionally, "[c]laims of discrimination and retaliation under the Rehabilitation Act and FMLA are considered analogous to those under Title VII [42 U.S.C. §§ 2000e *et seq.*] . . . ." *Scott v. Sebelius*, No. RWT-11-2865, 2013 WL 709765, 3 (D. Md. Feb. 25, 2013).  Therefore, the Court "'assess[es] retaliation claims pursuant to the Rehabilitation Act under the framework . . . use[d] in assessing Title VII retaliation claims.'" *Edwards v. Gwinnett Cnty. Sch. Dist.*, No. 1:11-CV-2581-TWT, 2013 WL 5492953, at *3 (N.D. Ga. Sept. 30, 2013) (quoting *Burgos–Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec.*, 410 F. App'x 243, 245 (11th Cir. 2011)).

Thus, to establish a prima facie case of retaliation in violation of the Rehabilitation Act, a plaintiff must show that "(1) she engaged in a protected activity; (2) the [employer] took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action." *Works v. Colvin*, 519 F. App'x 176, 186 (4th Cir. 2013) (citing *Hooven–Lewis v. Caldera*, 249 F.3d 259, 272–74 (4th Cir. 2001)).  The burden then shifts to the employer to "proffer[] a legitimate, non-retaliatory reason for the decision,"

and, if the employer does so, then the plaintiff "must rebut the reason as pretextual." *Works*, 519 F. App'x at 186 (citing *Brockman v. Snow,* 217 Fed. Appx. 201, 207, 208 n.6 (4th Cir. 2007) (Rehabilitation Act); *Yashenko v. Harrah's N.C. Casino Co.,* 446 F.3d 541, 551 (4th Cir. 2006) (Title VII)); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06 (1973)). Alternatively, a plaintiff may avoid the burden-shifting framework by establishing the three elements through direct evidence, that is, "'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Berkner*, 2013 WL 951562, at *8 (quoting *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391–92 (4th Cir. 2001) (citation omitted)).

Defendants do not challenge the first or third element. Rather, arguing that Ms. Wonasue "voluntarily resigned, and cannot prove that she was constructively discharged," Defendants insist that "[t]he Alumni Association . . . never took an 'adverse employment action' against [Plaintiff]." Defs.' Mem. 17. Defendants do not cite any authority for their assertion. Defendants also contend that, "while Nias may have denied Wonasue's request to work from home, the Alumni Association did not foreclose considering other appropriate accommodations." *Id*. at 17–18.

> To establish an adverse employment action in a retaliation claim,
>
> "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" To illustrate, the Supreme Court has described "[a] supervisor's refusal to invite an employee to lunch" as a trivial, non-materially adverse action, but has said that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement," is conduct that "might well" be materially adverse.

*Madock v. McHugh*, No. ELH-10-2706, 2011 WL 3654460, at *26 (D. Md. Aug. 18, 2011) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 69 (2006) (citations and

quotation marks omitted)). This standard "is less 'strenuous' than the standard in a discrimination claim," because "[t]he adverse employment action in a retaliation case need not affect an employee's 'terms or conditions of employment.'" *Id.* at *26 (quoting *Burlington N.*, 548 U.S. at 70). Indeed, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment related retaliatory acts and harm." *Burlington N.*, 548 U.S. at 67.

Even with this lower bar, none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee "AWOL"; or issuing a personal improvement plan, "an 'Attendance Warning,'" a verbal reprimand, "a formal letter of reprimand," or "a proposed termination." *Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011). However, when an employee experiencing pregnancy complications requests to work from home, "the denial of [the] request . . . might . . . be a material harm" because it "might deter one from participating in protected activity." *Brockman*, 217 F. App'x at 207 ("assum[ing], without deciding, that [denying such a request] was an adverse employment action"). Also, it is well established that constructive discharge is a form of adverse employment action. *Boone v. Goldin*, 178 F.3d 253, 255–56 (4th Cir. 1999), *abrogated on other grounds by Burlington N.*, 548 U.S. at 67; *Cohens v. Md. Dep't of Human Resources*, No. WDQ-11-3419, 2013 WL 3944451, at *5 (D. Md. July 30, 2013); *Banhi v. Papa John's USA, Inc.*, No. RWT-12-665, 2013 WL 3788573, at *6 (D. Md. July 18, 2013).

Plaintiff alleges that she suffered a litany of what she views as adverse employment actions:

> The Defendants have failed to accept Plaintiff's medical evaluation and request from her physician, failed to accommodate Plaintiff's disability, violated Plaintiff's statutory rights against discrimination, failed to follow accepted and lawful employment standards, procedures and policies, forced Plaintiff to expend

enormous sums of money in attorneys' fees to protect her statutory, contractual and constitutional rights, caused physical harm to Plaintiff and her baby, terminated Plaintiff's employment, failed to ameliorate and correct Defendant's wrongful acts upon receiving notice, and failed to provide Plaintiff the opportunity to seek reconsideration of any request for accommodation or termination decision.

Compl. ¶ 75.

In the light most favorable to Ms. Wonasue, the evidence shows that, on January 15, 2010, Ms. Nias met with Ms. Wonasue, who informed her that she was "'expecting' and would like to work from home on occasion." Jan. 15, 2010 Email from Nias to Beth Morgen,[4] Defs.' Mem. Ex. F, ECF No. 64-7. Ms. Wonasue also asked if, alternatively, she could use some of her remaining sick or annual leave. Pl.'s Answers to Interrogs. 4. In making her requests, Plaintiff said that she did not feel well, that she had experienced "vomiting and weakness," that she went to the hospital, and that "the doctor had advised [her] to take bed rest." Wonasue Dep. 173:7 – 174:12; Defs.' Mem. 4. Yet Plaintiff "did not indicate any medical restrictions, because at that time [she] did not have any." Fact Finding Report.

Ms. Nias would not look at the paperwork Ms. Wonasue had from her emergency room physician. Wonasue Dep. 175:8–17, 179:19–20, 181:4–8. She "denied the request[s] and used [the meeting] as an opportunity to reinforce what type of support [she] need[ed]." Jan. 15, 2010 Email from Nias to Beth Morgen. Specifically, Ms. Nias told Ms. Wonasue that she needed "[a] full-time, committed assistant"; "[s]omeone that can help [her] advance projects and respond in a timely manner to a number of issues"; and someone who will be in the office "from 8:30 to 5:00[] to provide the type of support [Ms. Nias] need[s]." *Id.* Additionally, Ms. Nias "asked [Plaintiff] to think about whether or not she could commit herself fully to being [her] assistant,"

---

[4] Beth Morgen was the Interim Executive Director of UMAA. Pl.'s Reply to Defs.' Opp'n to Pl.'s Am. Mot. for Leave to File First Am. Compl. Ex. 1, ECF No. 58-1.

and told her that "[i]f she could not, she would have to think about what she wanted to do."  *Id.*

Plaintiff resigned at the end of the next workday.  Wonasue Dep. Ex. 14.

As noted, Plaintiff characterizes her resignation as constructive discharge.  "Constructive discharge occurs when an employee resigns because the 'employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit.'"  *Banhi*, 2013 WL 3788573, at *6 (quoting *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186–87 (4th Cir. 2004)).  Therefore, to prove constructive discharge, a plaintiff must show "(1) the deliberativeness of [the employer's] actions, motivated by . . . bias, and (2) the objective intolerability of the working conditions."  *Honor*, 383 F.3d at 186–87.  Notably, "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  *Cohens*, 2013 WL 3944451, at *6 (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)).  The Fourth Circuit has stated that a plaintiff's allegations that

> her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back . . . , even if true, do not establish the objectively intolerable working conditions necessary to prove a constructive discharge.

*Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004).

Plaintiff has not shown that Ms. Nias was "motivated by . . . bias" or that her working conditions were intolerable.  *See Honor*, 383 F.3d at 186–87.  Nor has Plaintiff demonstrated that Ms. Nias forced her to work when she could not, as Plaintiff has not established that she had orders from a physician to be on bed rest at the time she requested to work from home or take leave.  Rather, Plaintiff only has shown that she was not pleased with her work conditions, i.e., the requirement that she work from the office rather than her home and that she not take sick leave, or Ms. Nias's response to her request.  *See* Wonasue Dep. 180:2–4 ("I thought she would

listen to me because I'd been doing a good job for her."); *Cohens*, 2013 WL 3944451, at *6. Therefore, she has not demonstrated that she was constructively discharged. *See Honor*, 383 F.3d at 186–87; *Cohens*, 2013 WL 3944451, at *6.

Still, the Fourth Circuit has stated that the denial of a request to work from home, made by an employee experiencing pregnancy complications, may constitute an adverse employment action. *See Brockman*, 217 F. App'x at 207; *see also Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 324 (4th Cir. 2011) (considering an ADA claim for failure to accommodate and concluding that "a reasonable jury could conclude that the [defendant's] culpable failure to accommodate [the plaintiff's request to alter her working conditions based on her disability] amounted to an adverse employment action"). Also, this Court and the Fourth Circuit have found denials of requests for sick leave to be adverse employment actions where plaintiffs consequently were not paid for their days off. *See Wells v. Gates*, 336 F. App'x 378, 384–85 (4th Cir. 2009) ("Based on the financial impact, we cannot say that a reasonable worker would not be dissuaded from engaging in protected conduct by the loss of this compensation from denial of sick leave."); *Allen v. Rumsfeld*, 273 F. Supp. 2d 695, 706 (D. Md. 2003) ("[D]enial of Plaintiff's leave requests qualifies as an adverse employment action" because it "resulted in Plaintiff not receiving pay she otherwise would have received."); *Scott-Brown v. Cohen*, 220 F. Supp. 2d 504, 511 (D. Md. 2002) ("[T]he denial of advanced sick leave, on our facts [in which plaintiff had to take unpaid leave but ultimately was fully compensated for her leave time], affected a benefit of Plaintiff's employment," such that it was an adverse employment action.).

Here, Plaintiff made her request without "indicat[ing] any medical restrictions"; indeed, "at that time [she] did not have any." Fact Finding Report. Yet she did tell Ms. Nias that she

was pregnant, that she had "been feeling sick the past weekend," that she experienced "vomiting and weakness," that she went to the hospital, and that "the doctor had advised [her] to take bed rest." Wonasue Dep. 173:7 – 174:12. Additionally, she offered her discharge papers to Ms. Nias. *Id.* at 179:19–20, 181:4–8. Although the evidence is slight, a reasonable jury could conclude that Plaintiff was asking to work from home or take leave to accommodate pregnancy complications that she thought she was experiencing.

Defendants argue that the denial in this case was not an adverse employment action because it "did not foreclose considering other appropriate accommodations." Defs.' Mem. 18. Yet, the denial was accompanied by a reminder of Plaintiff's job duties, with an emphasis on being in the office "full-time . . . from 8:30 to 5:00," and a warning that Plaintiff "would have to think about what she wanted to do" if she could not "commit herself fully." Jan. 15, 2010 Email from Nias to Beth Morgen. A reasonable jury could find that Plaintiff might not have felt comfortable requesting other accommodations after listening to that warning. The warning could be considered "an 'Attendance Warning,'" or perhaps even a verbal reprimand, neither of which on its own constitutes an adverse employment action. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011). Nonetheless, a reasonable jury could find that the denial of Plaintiff's request to work from home or to take sick or annual leave due to alleged pregnancy complications, accompanied by the warning that Plaintiff needed to commit herself to being at her job full-time, "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[5] *Madock*, 2011 WL 3654460, at *26 (quoting *Burlington N.*, 548

---

[5] Of course, "the Rehabilitation Act does not require an employer to eliminate essential job functions in order to accommodate a disabled employee." *Mitchell v. Astrue*, No. CCB-08-1873, 2009 WL 2043915, at *5 n.5 (D. Md. June 29, 2009) (citing 29 C.F.R. Pt. 1630, App. at § 1630.2(o) ("An employer or other covered entity is not required to reallocate essential functions.")). Even if being present at the office was an essential function of Plaintiff's job, the

U.S. at 68 (citations and quotation marks omitted)).  Therefore, a jury also reasonably could find that "'a reasonable employee would have found the challenged action materially adverse.'"  *Id.* (quoting *Burlington N.*, 548 U.S. at 68).  Thus, Plaintiff has established a *prima facie* case for retaliation.  *See Works*, 519 F. App'x at 186.

The burden shifts to Defendants to "proffer[] a legitimate, non-retaliatory reason" for the adverse employment action.  *Id.*  Defendants do not provide any reason whatsoever for denying Plaintiff's request to work from home while using the same conversation "as an opportunity to reinforce what type of support [Ms. Nias] need[ed]" and to alert Ms. Wonasue that if she could not be in the office regularly from 8:30 to 5:00, "she would have to think about what she wanted to do."  Jan. 15, 2010 Email from Nias to Beth Morgen.  Therefore, Defendants' Motion for Summary Judgment on Count IV is DENIED.

### C.    Interference with Plaintiff's FMLA Rights (Count VIII)

The FMLA was enacted, in part, "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1)–(2).  Pursuant to the FMLA, "an eligible employee is entitled to a total of twelve workweeks of leave during any twelve-month period and, upon return to work, restoration to the position held when the leave commenced or to an equivalent position." *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 515 (D. Md. 2008) (citing 29 U.S.C. § 2614(a)(1)(A)-(B)).

---

denial of Plaintiff's request could be an adverse employment action regardless of whether the request was reasonable, based on the effect it would have on a reasonable employee.  *See id.* (stating that, for a retaliation claim, "the court examines whether the alleged adverse employment actions were taken in retaliation for or to deter the protected activity rather than whether they were reasonable accommodations of the employee;s alleged disability"); *Madock*, 2011 WL 3654460, at *26.

To establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled.

*Id.* at 516 (citations omitted). The employee also must prove "that the violation prejudiced her in some way." *Anderson v. Discovery Commc'ns, Inc.*, 517 F. App'x 190, 197 (4th Cir. 2013) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); 29 U.S.C. § 2617(a)(1)); *Rodriguez*, 545 F. Supp. 2d at 523 (same).

Plaintiff alleges that Defendants "interfered with Plaintiff's exercise of her FMLA rights." Compl. ¶ 111. Defendants assert that Plaintiff "cannot satisfy any of the requirements of an interference claim," Defs.' Mem. 18, but they do not argue that Plaintiff did not give adequate notice or that UMAA did not deny Plaintiff benefits. They contend that UMAA "employed less than 50 employees at any one time," such that "it is not a 'covered' employer, and Wonasue was not an eligible employee under the FMLA." Defs.' Mem. 18. Defendants also argue that "Wonasue would not have qualified for leave because she did not have a 'serious health condition." Defs. Mom. 19. Finally, they insist that even if there were an FMLA violation, Plaintiff "was never harmed" because she "voluntarily quit her job the day after she allegedly requested leave." Defs.' Mem. 20.

### 1.    *Qualifying for FMLA leave*

An eligible employee may take FMLA leave for a "serious health condition," that is, "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider . . . ." 29 C.F.R. § 825.113(a); *see* 29 U.S.C. § 2611(11) (same). "Any period of incapacity due to pregnancy, or for prenatal care" is included in the definition of "[a] serious health condition involving continuing treatment by a health care

provider." 29 C.F.R. § 825.115(b). Thus, "[a]n employee who is pregnant may be unable to report to work because of severe morning sickness," and need not "receive treatment from a health care provider during the absence" or be absent "more than three consecutive, full calendar days" to qualify for FMLA leave. 29 C.F.R. § 825.115(f); *see* 29 C.F.R. § 825.120(a)(4) (same). Additionally, "[a] pregnant employee may take leave intermittently for . . . periods of severe morning sickness." 29 C.F.R. § 825.202(b)(1).

The emergency room physician diagnosed Plaintiff with hyperemesis of pregnancy, "a severe form of 'morning sickness.'" Discharge Instructions 4. Therefore, Plaintiff qualified for FMLA leave. *See* 29 U.S.C. § 2611(11); 29 C.F.R. § 825.113(a); 29 C.F.R. § 825.115(b); 29 C.F.R. § 825.202(b)(1). Summary judgment is not appropriate on this ground.

## 2.       *Covered employer*

For purposes of the FMLA, "[t]he term 'employer' . . . means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day" and "includes . . . any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(i)–(ii); *see* 29 C.F.R. § 825.104(a). Notably, "[a] plaintiff may bring a Title VII claim against an employer with fewer than fifteen employees where that employer is 'integrated' with another employer/s with a sufficient number of employees." *Tasciyan v. Med. Numerics*, No. AW-11-1467, 2012 WL 4811290, at *7 (D. Md. Oct. 9, 2012). Under those circumstances, "[s]eparate entities will be deemed to be parts of a single employer for purposes of FMLA," and "the employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility." 29 C.F.R. § 825.104(c)(2).

To determine "whether two or more entities are an integrated employer," the Court considers (1) whether the entities share management; (2) whether their operations are interrelated; (3) whether there is "[c]entralized control of labor relations"; and (4) the "[d]egree of common ownership/financial control." *Id.* The Court specifically considers whether "one company's employees hired and fired the other's employees," made employment decisions for the other company, and/or "handled the other's payroll," and well as whether "one company routinely transferred employees between it and the other company, used the same work force, and/or . . . exercise[d] more than general oversight of the other's operations." *Tasciyan*, 2012 WL 4811290, at \*7 (citations and quotation marks omitted). The question at the core of this "fact-intensive inquiry" is whether "one company employs the other's employees." *Id.* (citations and quotation marks omitted).

According to Defendants, the mission of UMAA "is to support and promote the University of Maryland College Park." Defs.' Mem. 2. Nonetheless, they insist that UMAA is a non-profit, independent 501(c)(3) organization with "no corporate relationship to the University, which is a state run public institution." *Id.* Defendants allege that UMAA "ha[s] a staff of about 14 full-time employees and four to five part-time employees," *id.*, such that UMAA "is not a 'covered' employer" for purposes of the FMLA, *id.* at 18. Yet, Janice McMillan, UMAA's Chief Financial Officer, provided an organizational chart for UMAA that lists forty-four positions, staffed by thirty-seven named individuals, in addition to the Alumni Association President and the Vice President of University Relations, to whom the Assistant Vice President for Development and Alumni Relations (Ms. Nias) reports. McMillan Dep. Ex. 1, Defs.' Mem. Ex. C, ECF No. 64-4. The chart also includes an undefined number of "MFE Admin Assts.," an undefined number of "MFE students," and "90 Student Callers."

Defendants explain that not all of the individuals on the chart are UMAA employees, as a number of them are employed by the University of Maryland College Park ("UMCP").  Defs.' Opp'n to Pl.'s Am. Mot. for Leave to File 1st Am. Compl. 6 ("Defs.' Opp'n to Mot. to Am."), ECF No. 50.  This explanation does not confirm that UMAA is not an employer for purposes of the FMLA by virtue of its small number of employees.  Rather, it calls into question whether UMAA and UMCP should be considered a part of one entity under the integrated employer test.  *See* 29 C.F.R. § 825.104(c)(2); *Tasciyan*, 2012 WL 4811290, at *7.  Notably, Ms. Nias, Plaintiff's boss and the one who hired her, was a UMCP employee.  Defs.' Opp'n to Mot. to Am. 5.  Additionally, Ms. Nias reported to Brodie Remington, a UMCP employee.  Wonasue Dep. 125:4-7.  Further, more than half of the positions listed on UMAA's chart were staffed by UMCP employees.  *See* Defs.' Mem. 2; Defs.' Opp'n to Mot. to Am. 6.  A reasonable jury could find that UMAA was integrated with UMCP.  Therefore, I cannot determine as a matter of law on the facts before me that UMAA was not an employer under the FMLA.  *See* 29 C.F.R. § 825.104(c)(2); *Tasciyan*, 2012 WL 4811290, at *7.  This, also, is not an appropriate basis for summary judgment.

### 3.    *Proof of harm*

Defendants insist that Plaintiff "was never harmed" because she "voluntarily quit her job the day after she allegedly requested leave."  Defs.' Mem. 20.  It is true that, where a "violation caused no harm," there can be no relief.  *Rodriguez*, 545 F. Supp. 2d at 523; *see* 29 U.S.C. § 2617(a)(1); *Ragsdale*, 535 U.S. at 89; *Anderson*, 517 F. App'x at 197.  In *Anderson*, "the only injury Anderson alleged as a result of [her employer's] alleged unlawful denial of her request for a reduced work schedule was that she was not permitted to work a reduced schedule."  517 F. App'x at 198.  Fatally, she did not "claim that she lost any compensation or benefits, sustained

other monetary loss, or suffered loss in employment status as a result of the purported interference." *Id.* Because "Anderson remained employed and was given full benefits until her termination," which "was a separate and unrelated event," the Fourth Circuit concluded that "her interference claim must . . . fail." *Id.*

Likewise, here, for the short span of time Plaintiff remained employed after her request for leave was denied, she does not claim that she incurred any losses, monetary or otherwise. Therefore, her interference claim fails as a matter of law. *See id.* Defendants' Motion for Summary Judgment is GRANTED as to Count VIII.

**III.     CONCLUSION**

Defendants' Motion for Summary Judgment is GRANTED IN PART as to Counts I, II, III, and VIII and DENIED IN PART as to Count IV.

A status call with regard to the one remaining count, Count IV, is scheduled for Monday, December 9, 2013, at 10:30 a.m. Plaintiff's Counsel will initiate the call.

A separate order shall issue.


Dated: <u>November 22, 2013</u>                    _____/S/_____
                                                    Paul W. Grimm
                                                    United States District Judge

lyb